IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BRAINSTORM INTERACTIVE, INC.,

                              Plaintiff,                          OPINION AND ORDER

      v.
                                                                  14-cv-50-wmc

SCHOOL SPECIALTY, INC.,

                              Defendant.

In this civil action, plaintiff Brainstorm Interactive, Inc. asserts various claims against defendant School Specialty, Inc., including federal claims for copyright and trademark infringement, and state law claims for conversion and violations of Wisconsin Statute § 101.18, Wisconsin's Deceptive Trade Practices Act. School Specialty admits infringing Brainstorm's trademark by marketing and selling approximately $5,000 worth of products with that trademark after the licensing agreement between the parties had expired. In all other respects, defendant disputes plaintiff's claims. Before the court are the parties' cross-motions for partial summary judgment. (Dkt. ##24, 28.) For the reasons that follow, the court will grant defendant's motion, entering judgment in favor as to all of Brainstorm's claims except for the trademark infringement claim.

PRELIMINARY MATTER

Upon receipt of the transcripts of two depositions taken in this case, plaintiff submitted lengthy errata sheets signed by the deponents Michelle Robinette and David Zasada. In response, defendant moved to strike these changes as going beyond the scope of revisions permitted under Federal Rule of Civil Procedure 30(e). (Dkt. #42.) Plaintiff

failed to respond timely to defendant's motion to strike, but moves the court to accept its late-filed response. (Dkt. #68.) Plaintiff's counsel represents in the motion that his opposition to the motion to strike was completed on the due date and that counsel believed he had filed the brief on that date, only realizing his failure to do so after defendant filed a reply brief noting the absence of any opposition. (*Id.*) Defendant then opposed plaintiff's motion to accept the late filing, but also submitted a revised reply if the brief were accepted. (Def.'s Reply (dkt. #71.) The court will grant plaintiff's motion for leave to accept its late opposition brief, finding any prejudice ameliorated by defendant's amended reply, but will be unsympathetic to any further lapses on the part of plaintiff's counsel.

As for the substance of defendant's motion to strike the errata sheets, Rule 30(e) provides in pertinent part:

> (e) Review by the Witness; Changes.
>
> (1) *Review; Statement of Changes.* On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
>
> (A) to review the transcript or recording; and
>
> (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

Fed. R. Civ. P. 30(e).

In *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383 (7th Cir. 2000), the Seventh Circuit considered the scope of Rule 30(e)(1)(B), especially in light of the Rule's allowance for changes in both "form or *substance*." The court held that "a change of

2

substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'" *Id.* at 389.[1]   In addition to the scope of the change allowed, Rule 30(e) also requires that the deponent state the "reasons" for the change.  Fed. R. Civ. P. 30(e); *see also Duff v. Lobdell-Emery Mfg., Co.*, 926 F. Supp. 799, 804 (N.D. Ill. 1996) (striking errata sheet where deponent failed to provide "a reason for every change").

With these nuances in the law, the court is not prepared to strike the errata sheets as a whole, but will consider specific challenges where relevant in the discussion of the facts below.  Even where the court denies defendant's motion to strike, the original deposition testimony remains part of the record, and defendant is free to cross-examine Robinette or Zasada at trial about their failure, for example, to remember key details during their respective depositions, to the extent revisions in their testimony may be material to the remaining damages issue resulting from defendant's admitted trademark infringement.

---

[1] In shaping this rule, the *Thorn* court relied on cases holding "that a subsequent affidavit may not be used to contradict the witness's deposition."  207 F.3d at 389.  Here, the circumstances are arguably different, in that the errata sheets were signed before motions for summary judgment were filed by the parties, meaning this is not quite as transparent and blatant of an attempt to drudge up a genuine dispute of material fact as with a so-called "sham affidavit."

UNDISPUTED FACTS[2]

### A.    The Parties

Plaintiff Brainstorm Interactive, Inc. is an Illinois corporation with its principal place of business in Cary, Illinois. David Zasada is its sole owner, having acquired the company in September 2008. Brainstorm is the successor-in-interest to Robinette Resources Inc. ("RRI"). Brainstorm is in the business of developing and distributing educational products, all of which are sold under the name "KnowItAll," which is the subject of this lawsuit.

Defendant School Specialty, Inc. is a Delaware corporation with its principal place of business in Greenville, Wisconsin. School Specialty is one of the leading providers of education products to teachers and schools, which it markets and sells through both a paper catalog and online store. School Specialty is the successor-in-interest to Sunburst Visual Media ("SVM"). Brainstorm's owner, Zasada, is a former employee of defendant School Specialty.

### B.  Development of KnowItAll Products

The KnowItAll products were developed in part by Michelle Robinette, the sole owner of Brainstorm's predecessor company, RRI. The KnowItAll product line consists of 147 products, identified as the "KnowItAll product list" and attached to the parties' joint stipulation of facts. (Joint Stip. (dkt. #21) ¶ 8; *id.*, Ex. 5 (dkt. #21-1).) The

---

[2] Unless otherwise noted, the court finds the following facts material and undisputed based on the parties' submissions on summary judgment.

products cover 41 titles, consisting of 17 literature titles and 24 curriculum titles.  For each title, there is an interactive DVD and certain print products, such as literature guides, graphic organizers and "talk about/write about" cards, as well as card games, the number and type of which vary by title.

The DVD products are interactive quiz games in a programmed format. Development of the KnowItAll DVD products included formation of at least the following components: (1) the quiz game questions themselves; (2) images; (3) voice over sounds; (4) software coding and production of the interactive DVD master; and (5) the product packaging.  Development of the KnowItAll print products (the literature guides, graphic organizers, talk about / write about cards, and card games) included creation of at least the following components: (1) text in each product; (2) images; and (3) packaging.

Among other contributions to the KnowItAll DVD products, Robinette wrote the quiz questions and answers.  Robinette did not create the images or graphics used in the DVDs; rather, they were either royalty-free or from Corbis, a stock photo agency.  The voice-over sounds were prepared by an individual named Steve Summers, though Robinette provided the script and edited the content.   The software coding and preparation of the interactive DVD master was done by ZOOtech.  The packaging for the DVDs was prepared by SVM, School Specialty's predecessor.  As for the print products, Robert Williams with "dpi Graphic Design" designed at least some of the print products at Robinette's direction.[3]   In addition, a company called Screenlife LLC was also an

---

[3] There seems to be no dispute that Robert Williams is the owner of dpi Graphic Design, so the court need not consider defendant's motion to strike ¶ 4 of Robinette's errata sheet where she purports to now "understand" that Robert Williams is the owner of dpi Graphic Design.  If

author of the KnowItAll products, although the record does not reveal in what capacity. The collaborative nature of the development of these products is perhaps best demonstrated by the fact that the first time Robinette saw some of the KnowItAll products was at her deposition on July 22, 2014.[4]

### C. Work-For-Hire Agreements

During her deposition, Robinette testified that she had written agreements with the individuals and entities who contributed to the development of the KnowItAll product line, including those described above, which transferred any rights or interests that they had in their work to Robinette and RRI. (Deposition of Michelle Robinette ("Robinette Depo.") (dkt. #23) 54-55, 59, 66-67, 136-38.)  While these agreements no longer exist (*id.*),[5] Robinette secured "Confirmation of Work for Hire" agreements in September 2014 -- after summary judgment motions were filed by the parties --  from Williams (on behalf himself and dpi Graphics), Screenlife LLC (signed by Charles

---

material, however, the court would strike this "correction" because Robinette's explanation for the change is too vague to satisfy the requirement that the deponent provide a reason for the change. *See Duff*, 926 F. Supp. at 804.  Indeed, it appears wholly based on hearsay.

[4] In paragraph 8 of her errata sheet, Robinette organizes her deposition testimony in such a way as to emphasize her central role in the development of the KnowItAll product line.  (Robinette Errata Sheet (dkt. #37) ¶ 8.)  To the extent that the errata sheet contains new testimony, it simply expands on that provided at her deposition, and does not contradict her deposition testimony.  Accordingly, the court will not strike ¶ 8 of her errata sheet, so far as it goes.  In any event, the errata testimony is largely immaterial in light of the court's grant of summary judgment to defendant on plaintiff's copyright claim.

[5] At the time Brainstorm Georgia was transferred from Robinette and RRI to Zasada, the only physical items Robinette provided Zasada were versions of certain KnowItAll DVD products and certain files.  In particular, no copies of agreements with any third parties were provided from RRI to Brainstorm.

Harper, V.P. of Business Development), ZOOtech, Inc. (signed by Clynton Hunt, V.P. of Business Development), and Summers. (Supplement Affidavit of David Zasada ("Zasada Suppl. Aff."), Exs. 57-60 (dkt. ##45-3 to 45-6).) In these agreements, the other authors attest that they each remember signing "Work for Hire" contracts in 2005 or 2006, around the time their work was completed, which assigned all interests and rights to RRI in consideration for the work completed. (*Id.*) The court will address defendant's challenge to these late-created agreements in the opinion below.

### D. Licensing Contracts between Brainstorm and School Specialty

Through their respective predecessor companies, RRI and SVM, the parties here entered into a series of contracts in which Brainstorm licensed the 147 KnowItAll products to School Specialty for production and sale. These licenses were initially entered into in 2005, with certain amendments in 2006 and 2008. (Joint Stip. (dkt. #21) ¶¶ 9, 13; *id.*, Ex. 11, parts 1 and 2 (dkt. ##21-2, 21-3).)[6] While the contracts are primarily written, the parties agree that some portions of the contracts may have been modified verbally or by course of dealing.

The contracts provided that School Specialty would pay Brainstorm royalties consisting of guaranteed minimums paid annually plus additional payments for sales above a certain threshold. The minimum annual royalties were $5000 for each of the

---

[6] From 2005 to 2008, "Sunburst Visual Media" was a tradename of Global Video, LLC, which was a subsidiary of School Specialty, Inc. In 2008, School Specialty sold most of the assets of Global Video, LLC, and School Specialty assumed direct ownership of the KnowItAll license agreements.

products with a literature title and $6000 for each of the products with a curriculum title. Combined, the total annual minimum royalty payment from School Specialty to Brainstorm across the 147 products was $229,000 per year.

On June 11, 2013, all contracts between the parties terminated, and School Specialty no longer had a license to use Brainstorm's trademarks or copyrights (assuming such existed).[7]

### E. Trademark Registration

In July 2006, RRI applied for a federal trademark registration of the following logo:



(8/15/14 Declaration of Jennifer L. Gregor ("8/15/14 Gregor Decl."), Ex. 5 (dkt. #25-5).) The U.S. Trademark Office issued Registration No. 3,286,333 for the KNOWITALL logo on August 28, 2007.  (7/3/14 Declaration of Jennifer L. Gregor ("7/3/14 Gregor Decl."), Ex. H (dkt. #17-8).)

---

[7] The actual unwinding was not quite as clean as this sentence might suggest, although the legal effect as of June 11, 2013, is.  In January 2013, School Specialty filed for Chapter 11 bankruptcy. School Specialty's debts were reorganized, and the company emerged from the Chapter 11 bankruptcy proceeding effective June 11, 2013.  During the course of the Chapter 11 proceedings, a number of School Specialty's contracts were rejected, including the licensing contracts with Brainstorm concerning the KnowItAll products.  (8/15/14 Gregor Decl., Ex. 17 (dkt. #45-17).)  All claims for payment owed to Brainstorm for amounts accrued prior to the June 11, 2013, were settled and released by way of a stipulation entered into in May 2014 and filed with the bankruptcy court.  (*Id.*, Ex. 18 (dkt. #25-14).)

As required by the parties' licensing agreements, School Specialty used the KNOWITALL logo (Registration Number 3,286,333) and the term KNOWITALL (collectively the "KNOWITALL Marks") in advertising and selling Brainstorm products from 2008 through June 11, 2013.  School Specialty also used the KNOWITALL Marks *after* June 11, 2013, including sales through at least December 16, 2013, and advertisement through at least early January 2014.

In addition to the KNOWITALL Marks, School Specialty also displayed the following "School Specialty Exclusive" image with some of the KnowItAll products it sold after June 11, 2013:



(Pl.'s PFOFs (dkt. #32) ¶ 39.)  School Specialty does not dispute that the use of this image in the sale of KnowItAll products after June 11, 2013, was untrue, deceptive and misleading because School Specialty was not a licensee -- and certainly not an exclusive licensee -- at that time.

### F.  Lack of Copyright Registrations

Neither Robinette, RRI, nor Brainstorm Interactive, Inc. ever applied for or obtained copyright registrations relating to any of the KnowItAll products.  Material to plaintiff's claim that it has been estopped from obtaining copyright registrations by

defendant's actions, it is undisputed that Brainstorm does not have a single copy of some of the products in the KnowItAll series.

Despite the lack of copyright registration, the licensing agreements provided that the products should bear a copyright notice. (*See, e.g.*, Joint Stip., Ex. 11 (dkt. #21-2) ¶ 23 at p.133.) When advertising, displaying for sale, and selling Brainstorm products after June 11, 2013, at least some of the time, School Specialty included a copyright notice naming the owner as Brainstorm (or its predecessor-in-interest, RRI).

**G. Zasada's Purchase of Brainstorm Interactive, Inc.**

In 2008, while Zasada was employed at the defendant School Specialty, Robinette approached Zasada about buying the KnowItAll product line from her. To prepare to sell the KnowItAll product line, Robinette formed Brainstorm Interactive, Inc., a Georgia corporation ("Brainstorm Georgia"), which was incorporated on June 5, 2008. (8/15/14 Gregor Decl., Ex. 6 (dkt. #25-6).) On September 2, 2008, Zasada and Robinette entered into a Stock Sale Agreement, selling the stock of Brainstorm Georgia to Zasada. (*Id.*, Ex. 1 (dkt. #25-1).) The Stock Sale Agreement lists the assets of Brainstorm Georgia in Paragraph 3, but does not identify any copyrights. (*Id.*) On September 4, 2008, Zasada (on behalf of Brainstorm Georgia) and Michelle Robinette (on behalf of herself or RRI) executed a written agreement assigning the KNOWITALL trademark to Brainstorm Georgia. (*Id.*, Ex. 7 (dkt. #25-7).) On October 14, 2008, Robinette (on behalf of RRI) and Zasada (on behalf of Brainstorm Georgia) executed another written agreement, transferring certain "ownership rights" in certain KnowItAll products from RRI to

Brainstorm Georgia.  (*Id.*, Ex. 8 (dkt. #25-8).)  The latter agreement also provided that RRI retained certain rights to the KnowItAll literature titles, including half of all royalties paid to Brainstorm on those products and a right of first refusal concerning future product development of those titles.  (*Id.*)  *None* of the 2008 agreements purported to transfer copyrights to Brainstorm Georgia.

On March 16, 2009, Robinette (on behalf of RRI) and Zasada (on behalf of Brainstorm Georgia) executed a written amendment to the October 14, 2008, agreement, adjusting the payment schedule for the transfer of "ownership rights."  (*Id.*, Ex. 9 (dkt. #25-9).)  On March 27, 2009, Zasada formed plaintiff Brainstorm Interactive, Inc., an Illinois corporation (which will continue to be referred to as "Brainstorm" as it has throughout this opinion, or "Brainstorm Illinois" where the distinction from Brainstorm Georgia is important).  At the time Zasada formed Brainstorm Illinois, no documents were executed to transfer assets of Brainstorm Georgia to Brainstorm Illinois, although Brainstorm Georgia was formally dissolved on May 13, 2009.  (*Id.*, Ex. 6 (dkt. #25-6).)

On January 28, 2014, the Hanson Law Firm recorded the September 4, 2008, trademark assignment in the United States Trademark Office, and listed the current owner and assignee of the KnowItAll Logo as Brainstorm Illinois, even though the September 4, 2008, assignment was to Brainstorm Georgia.  (*Id.*, Ex. 11 (dkt. #25-11).)  Plaintiff, somewhat incredulously, continues to contend that the September 4, 2008, "assignment was to Brainstorm Illinois," in the face of undisputed evidence that Brainstorm Illinois was not even formed until March 2009, some six months after the

assignment executed by Robinette (for RRI) and Zasada (for Brainstorm Interactive, Inc.).  (Pl.'s Resp. to Def.'s PFOFs (dkt. #44) ¶ 61.)

### H. Agreements Executed after the Filing of this Action

This case was filed in January 2014.  In May 2014, apparently attempting to clarify the transfer of rights, Robinette and Zasada actually managed to further complicate the paper trail (if that were possible) by executing a "Bill of Sale," which purports to confirm an "assignment" of rights that occurred by March 16, 2008. (8/15/14 Gregor Decl., Ex. 12 (dkt. #25-12).)  As described above, this, too, makes little sense, since Robinette did not even approach Zasada about purchasing the KnowItAll product line until June 2008, making any assignment of rights impossible by "March 16, 2008."

Likely recognizing the error in the date of this May 2014 agreement, Robinette and Zasada executed a second "Bill of Sale" on August 28, 2014, *after* summary judgment motions were filed in this case.  This agreement signed by Zasada, for himself and as President of both Brainstorm Georgia and Brainstorm Illinois, and Robinette, for herself and as President of RRI, purports to assign and transfer certain rights and interests to Brainstorm Georgia, as of March 16, 2009, and then transfer those same rights and interests from Brainstorm Georgia to Brainstorm Illinois on March 31, 2009.  (Zasada Suppl. Aff., Ex. 56 (dkt. #45-2).)[8]

---

[8] The court will obviously address the import of this late-created Bill of Sale in the opinion below.

## I.   School Specialty's Activities After June 11, 2013

Following the June 11, 2013, termination of its license agreements with Brainstorm, School Specialty continued to market and sell its educational products through a print catalog and online, including KnowItAll products.   In particular, KnowItAll products were included in the 2013 School Specialty Education Essentials "Big Book" catalog, which was printed and distributed in late 2012.  KnowItAll products did not appear in any other print catalog.

School Specialty uses Oracle E-Business Suite software to control both how and if individual products are presented for sale to customers.   Typically, School Specialty discontinues a product by phasing-out the product through various status changes in the Oracle system.  At a certain point in this process, the discontinued product will no longer be available for sale to customers and will be removed from School Specialty's website.

In early July 2013, after receiving an invoice from Zasada seeking payment for the second quarter of 2013, Curtis Rohr, the Assistant Corporate Controller of School Specialty at that time, followed up with the merchandising team with responsibility for the KnowItAll products to see if they were properly discontinued and no longer for sale on the company's website.  In response, the merchandising team performed a review to verify that the products were in a status that made them no longer available for sale.

Despite this action, Rohr learned in late August 2013, that the KnowItAll products were still on School Specialty's website.  On August 28, 2013, Rohr contacted the merchandising team again concerning the status of the KnowItAll products and asked to have them removed.  Rohr represents that the merchandising team then placed all of

13

the KnowItAll products on a "hold" status in Oracle, effective September 9, 2013, which should have made them no longer available for sale and removed them from the website. Despite this alleged change in status, sales of these products were made on October 17, October 21, and October 25, 2013.  (Def.'s PFOFs (dkt. #29) ¶ 85; Pl.'s Resp. to Def.'s PFOFs (dkt. #44) ¶ 85.)

In early December of 2013, School Specialty's Oracle data management team performed a back-end sweep audit which caused some of the KnowItAll products to switch from an "unsaleable" status to a "saleable" one.  On December 19, 2013, Zasada wrote to Rohr complaining that School Specialty continues to "market/promote" KnowItAll products.  In response, Rohr again investigated the status of the KnowItAll items, and represents that School Specialty took steps to "remove" the KnowItAll products from the website, including changing the Oracle status of the KnowItAll products and removing them from the internal price lists.  As a result, all of the KnowItAll products were taken off the School Specialty website by about January 10, 2014.

Based on sales figures from the Oracle system, after June 11, 2013, School Specialty transacted $5,021.81 in sales of KnowItAll products for a gross profit of $3,608.44.[9]  As part of those sales, Zasada himself purchased $333.35 worth of product in December 2013, which yielded a gross profit of $230.96.

---

[9] Plaintiff claims that School Specialty underreported its sales, relying on a discrepancy between the royalties report and other sales data.  (Pls.' Suppl. PFOFs (dkt. #46) ¶ 62.)  As defendant, explains, however, the discrepancy appears due to the Oracle reporting system; more importantly, School Specialty did not withhold any royalty payments based on the lower sales reported in the 2013 fourth quarter royalty statement.  (Def.'s Resp. to Pl.'s Suppl. PFOFs (dkt. #53) ¶ 62.)

### J.  KnowItAll Masters

One of Brainstorm's claims in this case is captioned "Copies and Masters: Conversion and Injunctive Relief," which asserts that School Specialty holds the masters for making copies of the KnowItAll products.  Brainstorm contends that the masters are the physical equipment necessary to make the KnowItAll products.  For the DVD products, the masters consist of Digital Linear Tapes ("DLTs") and digital files in Quark Express file format on CDs for the DVD case packaging, user's manuals, label art, and teacher's guides.  For the print products, the masters consist of digital files in Quark Express file format on CDs.  Between about June 19, 2006, and March 24, 2008, Brainstorm apparently sent School Specialty masters of the KnowItAll products.

Packaging slips shipped with the physical masters read in part:

> DAT tapes and digital files and all intellectual property remain the property of Robinette Resources [predecessor in interest of Brainstorm] and SVM [Sunburst Visual Media, predecessor in interest to School Specialty] must return all DAT tapes and files upon termination of the license otherwise SVM will be responsible for all related replacement costs.

(Declaration of Kyle Hanson ("Hanson Decl."), Ex. 21 (dkt. #35-4).)  In a June 16, 2006, email to Robinette, Michelle Yannes, an employee of SVM, stated "I have informed our purchasing team of the need to track the status of the masters and we understand that these are to be returned to you or their replacement will be at our expense."  (*Id.*, Ex. 22 (dkt. #35-5).)  Based on this, Brainstorm contends that it owns

15

these masters, despite never having been in physical possession of them.[10]   At some unknown date -- presumably after June 11, 2013 -- Brainstorm demanded return of the masters.

School Specialty obtained the KnowItAll products it sold from third-party suppliers.  It neither produced those products for itself nor obtained them from RRI or Brainstorm.  School Specialty's suppliers for the KnowItAll DVD products was Allied Vaugn, and its supplier for the print products was QP.  The last time School Specialty ordered KnowItAll DVD products from Allied Vaughn was November 25, 2008; the last time it ordered print products from QP was January 18, 2009.  School Specialty contacted both companies and asked for any masters, receiving none from Allied Vaughn, but QP returned a disc of files to School Specialty.  School Specialty also searched its own offices and located a box of DLT tapes and discs bearing labels for many of the KnowItAll product titles.  Curiously, Brainstorm has so far refused to inspect these returned materials to confirm that they constitute at least some of the physical masters. Other than those returned materials, School Specialty believes it does not have any masters for the KnowItAll products.

Plaintiff maintains that without the physical masters, Brainstorm cannot make copies of the products or contract with another distributor to secure royalties.  Defendant challenges Zasada's belief that the only way to secure source code is from the physical

---

[10] Defendant also disputes the proposed fact that Brainstorm Illinois owns the masters based on the lack of any agreement transferring assets from Brainstorm Georgia to Brainstorm Illinois.  (Def.'s Resp. to Pl.'s PFOFs (dkt. #39) ¶ 19.)   In reply, plaintiff relies on the August 28, 2014, Bill of Sale.  (Pl.'s Reply to Pl.'s PFOFs (dkt. #57) ¶ 19.)

masters, pointing out Zasada's lack of experience working with DLT technology. (Def.'s Resp. to Pl.'s Suppl. PFOFs (dkt. #53) ¶ 58.)

### K. Zasada's Business Plan

Relevant to plaintiff's conversion claim and claim for damages, Zasada's business plan for Brainstorm is to "develop new products for the school market in different formats." (Deposition of David Zasada ("Zasada Depo.") (dkt. #23) 112.) The only product Brainstorm has "in development," however, is a software application, and Zasada conceded during his deposition that "no work has been done" on the software application, including that no one has started to write software. (*Id.* at 115.) Zasada also testified that he had no customers lined up for Brainstorm's software application product.

Still, plaintiff maintains that there is "substantial, unmet demand" for the KnowItAll products. (Pl.'s Suppl. PFOFs (dkt. #46) ¶ 57.) In support, plaintiff cites to a supplemental affidavit of Zasada, in which he bases this conclusion on "(a) my knowledge and years of experience in the area of production and distribution of education products, including but certainly without limitation the KNOWITALL Products; (b) the emails from potential customers . . . ; [and] (c) my negotiations with production and distribution companies seeking quotes for the reproduction of the KNOWITALL Products and seeking potential new licensing partners." (Zasada Suppl. Aff. (dkt. #45) ¶ 6.)

During his July 21, 2014, deposition, Zasada testified to receiving over 100 emails from customers inquiring about the KnowItAll products, some as recently as a month

before his deposition.  (Zasada Depo. (dkt. #22) 116-17.)[11]  Defendant's attorney requested the emails during the deposition (*id.* at 118), and sent a follow-up letter and e-mails requesting the same (8/15/14 Gregor Decl., Exs. 13, 14 (dkt. ##25-13, 25-14)). Moreover, these emails were also the subject of requests for production served in April 2014, well before Zasada's deposition.  (10/3/14 Declaration of Jennifer L. Gregor ("10/3/14 Gregor Decl."), Ex. B (dkt. #51-2) RFPs ¶¶ 42-43.)  Instead of timely responding to defendant's request, plaintiff submitted approximately nine "[e]mails showing demand for products" in a supplemental affidavit in opposition to defendant's motion for summary judgment.  (Zasada Suppl. Aff., Ex. 55 (dkt. #45-1).)  The court will disregard these emails due to plaintiff's failure to produce them timely.  Fed. R. Civ. P. 37(d)(3).

Even without the emails purportedly showing customer demand, Zasada may rely generally on his own experience in this industry and specifically with respect to his negotiations with third parties about potential licenses of the KnowItAll product line to demonstrate its continued value.

---

[11] In an errata sheet, Zasada states that he has received 100 email and verbal requests, explaining that he thought the question asked concerned all requests (both email and verbal).  (Zasada Errata Sheet (dkt. #36) ¶ 2.)  If one were to view in isolation the question posed during his deposition, "How many requests for the KnowitAll product line have he received in the past year?," Zasada's explanation in his errata sheet would make sense.  (Zasada Depo. (dkt. #22) 116.)  However, in response to Zasada's answer "Probably just over 100," Attorney Gregor asked, "100 different e-mails asked for products in the KnowItAll products line?," to which Zasada replied, "Yes," without clarifying that the 100 requests purportedly covered both email *and* verbal requests.  (*Id.* at 116-17.)  To make matters worse, counsel then engaged in a lengthy discussion about these 100 e-mails, including whether the failure to preserve them constituted spoliation of evidence, without any acknowledgment from Zasada that "most requests were verbal" (as he now maintains in his errata sheet).  (*Id.* at 117-18; Zasada Errata Sheet (dkt. #36) ¶ 2.)  In light of all of this, the court finds Zasada's errata sheet explanation conflicts with his actual deposition testimony and will strike ¶ 2 for purposes of summary judgment.

OPINION

Based on defendant's alleged actions after the licensing agreement was terminated on June 11, 2013, plaintiff asserts the following causes of action: (1) copyright infringement; (2) conversion; (3) trademark counterfeiting; (4) Wis. Stat. § 100.18; and (5) trademark infringement.   The court will consider the parties' respective arguments as to each claim in turn.

## I.  Copyright Claim

Plaintiff contends that defendant infringed its copyrights by reproducing, distributing and publically displaying KnowItAll products after the termination of the licensing agreements.  17 U.S.C. § 106(1), (3), (5).  To establish such a claim, plaintiff must prove "(1) ownership of a valid copyright; and (2) unauthorized copying of constituent elements of the work that are original."  *Peters v. West*, 692 F.3d 620, 632 (7th Cir. 2012).  Moreover, as a threshold requirement, 17 U.S.C. § 411 also provides that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."

Defendant asserts two challenges to plaintiff's copyright infringement claim:  (a) the claim fails because Brainstorm does not have a federal copyright registration; and (b) Brainstorm lacks standing to sue on or register such copyrights because plaintiff, as a non-author, cannot demonstrate transfer of copyright ownership through a written

document.  Both of these challenges are independently dispositive of plaintiff's copyright claim.

### A.  Written Transfer of Copyright Ownership

A copyright "vests initially in the author or the authors of the work."  17 U.S.C. § 201.  Here, the authors of the KnowItAll products were Robinette and RRI and the other third-party contributors.  Plaintiff Brainstorm Interactive, Inc., an Illinois corporation, must, therefore, demonstrate the transfer of title from the original authors to itself. *Foamation, Inc. v. Wedeward Enters., Inc.*, 970 F. Supp. 676, 683 (E.D. Wis. 1997) ("[W]hen a plaintiff . . . is not the author of the copyrighted work, the plaintiff must prove a proprietary right through a change of title in order to have standing to sue."). Moreover, and particularly problematic for Brainstorm, any transfer of a copyright "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is *in writing* and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a) (emphasis added); *see also* 17 U.S.C. § 101 (requiring parties to "expressly agree in a written instrument signed by them that a work shall be considered a work made for hire").

As described in the facts section above, plaintiff must demonstrate the following, written chain of title:

1) Other authors of KnowItAll products to Michelle Robinette/RRI;

2) Michelle Robinette/RRI to Brainstorm Georgia (Robinette owned);

3) Brainstorm Georgia (Robinette owned) to Brainstorm Georgia (Zasada owned); and

4) Brainstorm Georgia to Brainstorm Illinois.

Defendant argues that plaintiff lacks standing because it cannot prove that Michelle Robinette obtained the necessary transfer of copyright from the other authors (the 1st transfer), and even assuming Brainstorm Georgia owned the copyrights (in other words, all of the transfers occurred as 1 through 3 listed above), there is no written document demonstrating the transfer of copyrights from Brainstorm Georgia to Brainstorm Illinois (the 4th transfer).

As for the first challenge, plaintiff has put forth sufficient evidence to raise a genuine issue of material fact as to whether the four other authors of the KnowItAll product line transferred their ownership interests in written, work-for-hire agreements at the time the work was completed in 2005 and 2006.  Defendant raises two core challenges to the late-created agreements between Robinette on behalf of RRI and the four other authors involved in the creation of the KnowItAll products.  First, defendant contends that the court should strike the September 2014 work-for-hire agreements because they were not produced timely in response to requests for production.  (Def.'s Reply to Def.'s PFOFs (dkt. #52) ¶ 31 (citing 7/3/14 Gregor Decl., Ex. D (dkt. #17-4); *Schell-Baggs v. Bank of Am.*, No. 07-cv-671-bbc (W.D. Wis. May 13, 2008) (dkt. #38) ("[T]he court does not require parties to disclose information they do not have; on the other hand, it will not allow a requesting party to be sandbagged during summary judgment or other pretrial procedures by an opposing party's use of information that previously was requested but not disclosed.")).)  While the court agrees with defendant that plaintiff's tactic of creating material documents after summary judgment motions

were filed constitutes a kind of sandbagging, the agreements did not exist until right before plaintiff's opposition to defendant's motion was filed, and their production is similar to obtaining affidavits in response to a motion for summary judgment, which no one would view as sandbagging, unless there were evidence that the moving party was misled as to the affiant's existence, knowledge or the averred facts.   Since defendant offers no evidence of that kind, these documents were timely produced.   Finding no other basis to strike these documents, the court declines to do so.

Second, defendant contends that even if these *nunc pro tunc* documents were admissible, plaintiff must put forth evidence demonstrating that the purported copyright transfers actually occurred in connection with the KnowItAll products, and plaintiff has failed to do just that.   (Pl.'s Reply to Pl.'s PFOFs (dkt. #52) ¶ 31 (citing *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 830 (3d Cir. 2011) ("For a writing to 'validate a past transfer, the past transfer must have actually occurred.")).)   While the court agrees with defendant on the law, plaintiff has put forth sufficient evidence from which a reasonable jury could find the first necessary transfer in the list above.   Each of the third-party authors or contributors to the KnowItAll products avers that he signed a work-for-hire agreement transferring rights at the time the work was completed.   Moreover, Robinette also testified at her deposition that she had obtained work-for-hire or copyright transfer agreements from each of these third parties during the development of the KnowItAll products.[12]   As such, the court finds that plaintiff has raised a genuine issue of material

---

[12] The court acknowledges that Robinette's testimony is weak, especially in light of her testimony that the terms of the agreements she signed with each of the authors were consistent with the terms in Exhibit 9 to Zasada's deposition (the October 14, 2008 agreement between RRI and

fact as to whether Robinette secured written transfer agreements at the time the four other authors created the KnowItAll product line.

Unfortunately for plaintiff, proof of the fourth transfer from Brainstorm Georgia to Brainstorm Illinois, is still lacking.  It is undisputed that there were no written documents transferring assets from Brainstorm Georgia to Brainstorm Illinois at the time Brainstorm Illinois was created.  Recognizing this defect, plaintiff attempted to cure it in a document executed approximately eight months after this case was filed.  The law is clear, however, that standing is evaluated at the time suit is filed.  *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) ("[W]e have an obligation to assure ourselves that [Friends of the Earth] had Article III standing at the outset of the litigation."); *Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 743 n.2 (7th Cir. 2009) ("[A] plaintiff must establish standing at the time suit is filed and cannot manufacture standing afterwards."); *Perry v. Vill. of Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999) ("The requirements of standing must be satisfied from the outset.").

Indeed, courts routinely dismiss claims for lack of standing where the plaintiff attempts to cure the defect *after* filing of suit.  For example, in *Pollack*, the court held that the plaintiff could not establish standing to bring an environmental challenge to the government's practice of discharging bullets into a lake by visiting the park where the lake was situated *after* filing the suit.  577 F.3d at 742-42 & 743 n.2.  Similarly, in *Perry*,

---

Brainstorm Interactive), which does *not* contain any express work-for-hire provision.  Still, she testified that each of the four contributors to the KnowItAll products signed agreements transferring their respective copyright interests to Robinette/RRI at the time the work was completed, testimony now corroborated by the contributors.

the Seventh Circuit rejected plaintiff's "attempt to satisfy the requirements of standing as the case progressed," by purchasing a vehicle *after* filing his complaint so as to challenge a law authorizing the seizure and disposal of abandoned vehicles.  186 F.3d at 830.  So, too, here.  At the time the lawsuit was filed, whatever oral understanding existed, there were no *written* documents transferring any copyright interest (or any other interest for that matter) from Brainstorm Georgia to Brainstorm Illinois.[13]

Normally the court would not reach other arguments if a party lacked standing to bring a claim, but here, there is at least some question as to whether School Specialty as a non-transferee may raise a challenge under 17 U.S.C. § 204(a).  *See Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 592-93 (7th Cir. 2003) ("[W]here there is no dispute between the copyright owner and the transferee about the status of the copyright, 'it would be unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement.'" (quoting *Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc.*, 70 F.3d 96, 99 (11th Cir. 1995)).  As such, the court will also consider defendant's argument that plaintiff's copyright infringement claim fails for lack of registration.

## B.  Copyright Registration Requirement

While courts previously construed the pre-suit registration requirement under 17 U.S.C. § 411 as a jurisdictional one, the United States Supreme Court in *Reed Elsevier,*

---

[13] This is distinct from the work-for-hire agreements, where Robinette and the other authors all aver that they executed agreements at the time the work was completed, even though these agreements no longer exist.

*Inc. v. Muchnick*, 559 U.S. 154 (2010), held that registration was a claims processing rule, not a jurisdictional bar to suit. *Id*. at 166. Except in instances where a defendant may be willing to waive any challenge under § 411, the practical impact of this distinction seems limited. *See* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 7.16[B][2][c] (Matthew Bender, Rev. Ed.) ("After all, whether denominated a requirement for subject-matter jurisdiction or a rule required to process the claim, plaintiff must comply or face dismissal. The major difference, presumably, is that the latter requirement falls away if not challenged, whereas the former can never be waived[.]"). Still, plaintiff contends, relying on cases from other contexts, that a nonjurisdictional bar to suit -- like the registration requirement -- is susceptible to certain doctrines, like waiver and equitable estoppel. (Pl.'s Reply (dkt. #55) 4 (citing *Lewis v. Washington*, 300 F.3d 829, 834 (7th Cir. 2002) ("[N]on-jurisdictional prerequisites to suit in federal court are typically subject to equitable estoppel.")).)

The application of waiver makes sense. There might be instances where defendant wants to reach the merits rather than dismiss without prejudice to only refile after registration is obtained. Indeed, that was the situation in *Reed Elsevier* itself, where the Court considered a class action settlement and found that the lack of registration -- an issue raised by class objectors -- was not a jurisdictional bar. *Reed Elsevier*, 559 U.S. at 166. Similarly, there may be even instances where the defendant simply fails to raise this defense timely. *See Paycom Payroll, LLC v. Richison*, 758 F.3d 1198, 1203 (10th Cir. 2014) (relying on holding in *Reed Elsevier* to find defendant waived any challenge to lack of copyright registration).

25

Equitable estoppel, however, proves a harder fit.  When would an author or owner of copyrightable work *not* be able to register (or even preregister) the copyright before filing suit?  Still, plaintiff contends that it has support for this theory:  "Albeit in a different context, the Supreme Court also recently confirmed that equitable estoppel applies over and above the text of the Copyright Act.  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1977 (2014)."  (Pl.'s Opening Br. (dkt. #33) 7.)  A party's general citation to a brand new Supreme Court case in support of its theory without any detail or even providing a parenthetical raises red flags and, indeed, *Petrella* does *not* support plaintiff's theory.  Instead, the case stands for the well-established use of the doctrine to estop a claim "when a copyright owner engages in intentionally misleading representations concerning his abstention from suit, and the alleged infringer detrimentally relies on the copyright owner's deception." *Petrella*, 134 S. Ct. at 1977.[14]

Even if equitable estoppel could apply in this context -- as an excuse for plaintiff's failure to register its copyright as required before bringing an infringement suit -- the facts do not support its application here.  Plaintiff contends that it (or rather RRI) could not have obtained copyright registrations earlier, because "[i]t was [School Specialty's] job [] to make copies and publish the works, leaving Brainstorm without any copies of its own, save any copies that [School Specialty] provided to Brainstorm."  (Pl.'s Reply (dkt. #55) 6.)

---

[14] As far as this court could identify, the only court willing to consider whether equitable estoppel applies to excuse a plaintiff's failure to register a copyright before filing suit, also refused to apply it.  *See Jones v. West Plains Bank* & *Trust Co.*, No. 1:12CV00052–SWW, 2014 WL 4232391, at *2 (E.D. Ark. Aug. 27, 2014) (rejecting plaintiff's request that the court apply estoppel to waive the registration requirement).

To establish equitable estoppel, a party must demonstrate: "(1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *Lewis v. Washington*, 300 F.3d 829, 834 (7th Cir. 2002) (citing *LaBonte v. United States*, 233 F.3d 1049, 1053 (7th Cir. 2000)). In contrast, plaintiff's estoppel theory rests not on a misrepresentation by defendant, but rather on defendant's alleged failure to return the physical masters. Perhaps recognizing this, the parties both point to Wisconsin law where the first element is "action or nonaction on the part of one against whom the estoppel is asserted." (Def.'s Reply (dkt. #54) 6 (citing *In re Estate of Alexander*, 75 Wis. 2d 168, 183-84, 248 N.W.2d 475, 483 (1977)).) While the court sees no basis to apply Wisconsin's equitable estoppel doctrine to a federal claim, given the parties' agreement in this case, the court is willing to extend the federal doctrine beyond misrepresentations to other inequitable actions or inactions by the defendant.

But this does not save plaintiff's claim. First, contrary to plaintiff's argument that the merits of its equitable estoppel defense should be tried to a jury, the application of this doctrine is an issue for the court. *See Jennings Water, Inc. v. City of N. Vernon, Ind.*, 895 F.2d 311, 316 (7th Cir. 1989) ("Whether facts proven are sufficient to constitute an estoppel is a question of law properly before this court for review."). Second, and more importantly, plaintiff has failed to offer evidence permitting any reasonable trier of fact to find that: (a) defendant's alleged refusal to return the physical masters bars (at least entirely) its ability to register the KnowItAll products for copyright protection; and (b) its reliance on a contractual term to give away its only copies of a purported valuable master

27

to a licensee was reasonable.  On the first point, plaintiff (or its predecessor) could have either produced the materials itself to obtain copies for copyright registration purposes or it could have actively sought copies of the products produced by School Specialty to secure registration.  The fact that School Specialty produced the KnowItAll product line or that one of the licensing agreements provided that School Specialty would provide RRI up to 50 copies for promotional purposes does not excuse plaintiff (or its predecessor company) from actively seeking and registering copies of those products.

Even if both of those efforts had failed, the undisputed record demonstrates that Brainstorm has at least one copy of some of the products, and it could have registered those products, or preregistered those products even if the copyright office had demanded a second copy.  *See* 37 C.F.R. § 202.20(c)(2)(i)(F) and (j) (requiring only one copy of multimedia kits and two-dimensional games).  Brainstorm's utter failure to take any action to register the copyrights shows a complete lack of diligence on its part until after it brought suit, upending its reliance on defendant's alleged failure to return the physical masters to excuse its lack of registration.  *See Shropshear v. Corp. Counsel of City of Chi.*, 275 F.3d 593, 595 (7th Cir. 2001) (requiring plaintiff invoking equitable estoppel doctrine to exercise due diligence in filing suit).

As for the second point, assuming plaintiff could somehow blame defendant for its complete failure to register the copyrights, it is patently unreasonable for a company to give its only copy of an alleged valuable physical masters to a licensee for safekeeping.  At the very least, plaintiff has failed to demonstrate that its actions were reasonable.  *See Prestwick Capital Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 665 (7th Cir. 2013)

28

(rejecting equitable estoppel claim where plaintiff's claimed lack of knowledge was not reasonable); *Teamsters & Employers Welfare Trust of Ill. v. Gorman Bros. Ready Mix*, 283 F.3d 877, 885 (7th Cir. 2002) ("An unsuccessful gamble is not a form of reasonable reliance.").   Plaintiff had a range of reasonable options available to it:   (1) secure copyright registrations before handing off its only copy of the physical master to defendant; (2) make a second copy of the physical masters; or (3) specifically require their return after the initial production run to register the copyrights at that time.

For all these reasons, the court will grant defendant summary judgment on plaintiff's copyright infringement claim.

## II. Conversion Claim

Plaintiff also brings a claim of conversion based on defendant's alleged failure to return the physical masters.   To demonstrate conversion under Wisconsin law, plaintiff must prove: "(1) intentionally controlling/taking property belonging to another; (2) controlling/taking property without the owner's consent; and (3) those acts resulting in serious interference with the rights of the owner to possess the property."   *Bruner v. Heritage Cos.*, 225 Wis. 2d 728, 736, 593 N.W.2d 814, 818 (Ct. App. 1999).

As an initial matter, plaintiff concedes that: (1) its claim of conversion only applies to tangible property (Pl.'s Opp'n (dkt. #43) 4); and (2) to the extent its claim sought to bar defendant from unauthorized use of the masters, such a claim would be preempted by the Copyright Act (*id.* (discussing *Seng-Tiong Ho v. Taflove*, 648 F.3d 489 (7th Cir. 2011))).   Defendant contends that plaintiff's conversion claim is barred by

29

Wisconsin's economic loss doctrine.   Under this doctrine, "contracting parties are generally precluded from pursuing tort recovery for 'purely economic' or 'commercial losses' associated with their contract relationship." *Hackel v. Nat'l Feeds, Inc.*, 986 F. Supp. 2d 963, 973 (W.D. Wis. 2013) (quoting *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶¶ 33-35, 262 Wis. 2d 32, 662 N.W.2d 652).   "Recognizing that the parties had a chance to allocate the economic risks at the time of contracting, the 'doctrine generally requires transacting parties in Wisconsin to pursue only their contractual remedies when asserting an economic loss claim.'" *Hackel*, 986 F. Supp. 2d at 973-74 (quoting *Tietsworth v. Harley–Davidson, Inc.*, 2004 WI 32, ¶ 24, 270 Wis. 2d 146, 677 N.W.2d 233).

While this court has found Wisconsin courts' broad application of the economic loss doctrine troubling at times, *see Hackel*, 986 F. Supp. 2d at 981, the doctrine proves an easy and fair fit where the parties expressly *contracted* for the return of the physical assets.   Indeed, absent this contractual provision, defendant would arguably have had no duty to maintain the masters provided by plaintiff.   Still, plaintiff contends that the economic loss doctrine does not bar plaintiff's conversion claim because (1) the contract was for services, not goods; and (2) plaintiff's injury is not an economic loss.   (Pl.'s Reply (dkt. #55) 8.)

As to plaintiff's first argument, the Wisconsin Supreme Court held in *Insurance Company of North America v. Cease Electric Inc.*, 2004 WI 139, ¶ 52, 276 Wis. 2d 361, 688 N.W.2d 462, "the economic loss doctrine is inapplicable to claims for the negligent provision of services," but the contract at issue here is not one for the provision of services.   Rather, the contract provides for School Specialty's use of Brainstorm's

30

intellectual property and trademark to manufacture, market and sell goods in return for School Specialty's payment of a royalty fee.  While Brainstorm certainly benefits from Brainstorm's successful sale efforts in the form of a royalty, this contractual relationship is not one for services like that contemplated in *Insurance Company of North America*.

Plaintiff's second argument -- that the injury it suffered is not an economic loss -- depends on its reading of *H.A. Friend & Company v. Professional Stationery, Inc.*, 2006 WI App 141, 294 Wis. 2d 754, 720 N.W.2d 96.  In that case, the Wisconsin Court of Appeals declined to apply the economic loss doctrine to a conversion claim, but that holding depends on a distinct set of facts, which that court draws itself.  In *H.A. Friend*, a former franchisee withdrew funds from bank accounts in violation of the parties' franchise termination agreement.  2006 WI App 141, ¶¶ 4-6.  In denying defendant's motion to dismiss a conversion claim as barred by the economic loss doctrine, the court explained that defendant "did not simply fail to turn over the purchased assets to [plaintiff], which is a risk [plaintiff] could have reasonably anticipated and addressed in the contract, but depleted the accounts by spending funds that belonged to [plaintiff]." 2006 WI App 141, ¶ 16 (all caps removed).  Here, the defendant allegedly refused to turn over the physical masters, which is a risk the parties not only *could* have reasonably contemplated, but *did* contemplate in their licensing agreements.  Moreover, the court in *H.A. Friend* also relied on the fact that the defendant there "had a duty, regardless of the existence of the contract, not to retain or use money that belonged to [plaintiff] without [plaintiff's] consent or authorization." *Id.* at ¶ 17.  Here, plaintiff has identified no other

basis requiring defendant to preserve, much less return, the physical masters, except for the contractual provision itself.

Defendant also seeks summary judgment on the basis that plaintiff has failed to demonstrate a "serious interference" with its rights to possess the masters, because plaintiff has no viable plans to use them in the future.  On that point, the court disagrees. Plaintiff has put forth sufficient, though hardly overwhelming, evidence -- through Zasada's deposition testimony and supplemental affidavit -- to infer that it could use the masters to license with a different company to produce the KnowItAll DVD and print product lines, or at least that the physical masters could play some role in creating a software application.

What proves more troubling at this late stage of the litigation is plaintiff's failure to demonstrate *which* physical masters, if any, defendant still controls or possesses.  In other words, it is plaintiff's burden to demonstrate this first element of a conversion claim and its failure to review the returned DLT tapes and other materials and attempt to catalog these materials against the list of KnowItAll products is inexcusable.  The court, however, need not determine whether summary judgment is warranted on plaintiff's failure to put forth evidence demonstrating that defendant still controls or possesses certain physical masters in light of its finding that the conversion claim is barred by the economic loss doctrine.[15]

---

[15] Even if this were not the case, there is another troubling aspect to plaintiff's claim:  its apparent failure to assert it at the time of the defendant's reorganization in bankruptcy, where all creditors could assert a right to this allegedly valuable asset.  Indeed, any obligation to release this asset to plaintiff would presumably be discharged, along with any royalty payments owed as of June 11,

Finally, in a footnote, Brainstorm indicates that if the court holds that the economic loss doctrine bars its conversion claim, it "would seek leave to amend its complaint to add whatever contract claim the Court determines would be permitted in the circumstances." (Pl.'s Reply (dkt. #55) 9 n.10.) The court is generally sympathetic to such motions, but plaintiff could have -- and should have -- sought leave to amend its complaint at the time defendant challenged its conversion claim as barred by the economic loss doctrine. By sitting on this request to amend while the motions for summary judgment were pending, plaintiff failed to act diligently. *See Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 666 (7th Cir.2007) (listing "undue delay" as one basis for denying leave). Still, the court will at least entertain a motion for leave to amend the complaint, provided plaintiff brings it promptly and addresses (1) which of the physical masters defendant has failed to date to return; and (2) the potential impact of the May 2014 bankruptcy settlement on this claim.

### III. Trademark Counterfeiting Claim

Plaintiff asserts a trademark counterfeiting claim under 15 U.S.C. § 1116.[16] Unlike infringement claims, a counterfeiting claim is limited to those marks which have been registered with the United States Patent and Trademark Office. 15 U.S.C. § 116(d)(1)(B)(i). Somewhat half-heartedly, defendant raises a challenge to standing on

---

2013, or certainly by the date of the parties' May 2014 stipulation entered into in the bankruptcy court.

[16] In its complaint, plaintiff also asserted a counterfeiting claim under Wisconsin law, Wis. Stat. §132.001, but stated in its opposition brief that it has withdrawn this claim. (Pl.'s Opp'n (dkt. #43) 11.)

the basis that Brainstorm Illinois was never assigned the registered KNOWITALL trademark.  (Def.'s Opening Br. (dkt. #30) 23.)

Like copyrights, assignments of registered trademarks must also be in writing.  15 U.S.C. § 1060(a)(3) ("Assignments [of a registered trademark] shall be by instruments in writing duly executed.").  As described above, the undisputed record demonstrates that at the time of Brainstorm Illinois' formation (or at least by the time plaintiff filed suit), no documents were executed to transfer assets of Brainstorm Georgia to Brainstorm Illinois. Moreover, the January 2014 recording of the September 2008 assignment of the KNOWITALL trademark cannot fix this standing issue, since it is undisputed that the assignment of the trademark was to Brainstorm Georgia, not Brainstorm Illinois.  While plaintiff attempted to correct these defects in its second Bill of Sale on August 14, 2014, that document was not executed until after this lawsuit was filed and cannot cure the standing issue.  *See Friends of the Earth, Inc.*, 528 U.S. at 180; *Pollack*, 577 F.3d at 743 n.2; *Perry*, 186 F.3d at 830; *Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774, 780 (Fed. Cir. 1996) (reversing entry of judgment for plaintiff in trademark claim where plaintiff lacked standing because trademark was not assigned to plaintiff in a written document prior to plaintiff filing suit).  However, because this argument was not fully developed by defendant, nor was it maintained in its reply brief in support of its motion for summary judgment, the court will also consider the merits of the claim.[17]

---

[17] At least *Friends of the Earth* would suggest that this is a jurisdictional hurdle, which would prevent the court from proceeding to the merits, but at least one court has described this requirement as a "statutory standing" requirement.  *See Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 73 (2d Cir. 2013).

"Counterfeiting is the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark."  4 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 25:10 (4th Ed. 2014). Because these cases typically involve efforts to imitate a well-known product to deceive customers, "counterfeiting is 'hard core' or 'first degree' trademark infringement and is the most blatant and egregious form of 'passing off.'"  *Id.* (quoting Jed S. Rakoff & Ira B. Wolff, Commercial Counterfeiting and the Proposed Trademark Counterfeiting Act, 20 Am. Crim. L. Rev. 145 (1982)).  In light of the especially egregious characteristic of a counterfeiting claim, a successful plaintiff may seek treble actual damages, together with attorney's fees, or opt for statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just."  15 U.S.C. § 1117(b), (c).

A Lanham Act counterfeit trademark claim *does not cover*

> any mark or designation used on or in connection with goods or services of which the manufacture[r] or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the types of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.

15 U.S.C. § 1116(d)(1)(B).  At the time defendant manufactured or produced the alleged KnowItAll products or website content, School Specialty *was* an authorized licensee of that mark.  Indeed, the record demonstrates that (1) School Specialty last manufactured or produced KnowItAll products in 2008 and 2009, and (2) School Specialty was authorized to use the trademark as a licensee from 2008 through June 11, 2013.

Plaintiff attempts to manipulate the language of the Lanham Act to argue that "[a]n infringing incident (manufacture or production) may be whenever a mark is used 'in connection with goods' -- and if (and only if) authorized at the time of that incident would the infringer be excused from counterfeiting liability."   (Pl.'s Opp'n (dkt. #43) 9.) This interpretation is nonsensical.  By describing the manufacture or production of the goods in question, the statute expressly demarcates those activities from any subsequent marketing or sale.

As defendant persuasively argues, this case involves "overrun goods," which do not support a trademark counterfeit claim.  "If a licensee manufactures overruns during the course of a valid license, the marks on those goods will remain noncounterfeit for the purposes of [the Lanham Act], whatever changes may later occur in the relationship between the trademark owner and the licensee." *All Star Championship Racing, Inc. v. O'Reilly Auto. Stores, Inc.*, 940 F. Supp. 2d 850, 866 (C.D. Ill. 2013).  While the court in *All Star* used certain language suggesting that the counterfeiting exception does not apply if the "*incident* or product alleged to be infringing *occurred* or was manufactured after the alleged infringer no longer had authorization to use the mark," the court held that the content created with the marks *after* termination of the sponsorship agreement was counterfeit, but that the website content created *before* the termination of the agreement was not.  *Id.* at 866-67, 871 (emphasis added).  The latter constitute the undisputed facts here.[18]

---

[18] The other case cited by plaintiff similarly fails to provide the support claimed, since it, too, involved use of a mark in the production or manufacture of a good after a license had been revoked.  *See Idaho Potato Comm'n v. G&T Terminal Packaging, Inc.*, 425 F.3d 708, 711-12, 720-22

In reply, plaintiff also attempts to shift the focus of its counterfeiting claim to School Specialty's use of the "School Specialty Exclusive" image in conjunction with the KnowItAll products. The "School Specialty Exclusive" image -- even assuming it is a trademark – is decidedly *not* plaintiff's mark, nor can plaintiff claim that it registered this mark or has any ownership interest in it. While it is undisputed that the use of the image in conjunction with the KnowItAll products after June 11, 2013, was untrue and misleading, there is no claim that fits within the counterfeiting framework nor even within the trademark framework.

## IV. Wisconsin Deceptive Trade Practices Act Claim

Plaintiff also relies on defendant's use of the "School Specialty Exclusive" image in conjunction with its sale of KnowItAll products after June 11, 2013, to assert a claim under Wisconsin's Deceptive Trade Practice Act, Wis. Stat. § 100.18(1). To prove a claim under this statutory provision, plaintiff must demonstrate "(1) the defendant made a representation to the public with the intent to induce an obligation, (2) the representation was 'untrue, deceptive or misleading,' and (3) the representation materially induced (caused) a pecuniary loss to the plaintiff." *MBS-Certified Pub. Accountants, LLC v. Wis. Bell Inc.*, 2013 WI App 14, ¶ 19, 346 Wis. 2d 173, 828 N.W.2d 575 (quoting *Novell v. Migliaccio*, 2008 WI 44, ¶ 49, 309 Wis. 2d 132, 749 N.W.2d 544).

Defendant seeks summary judgment on this claim because Wis. Stat. § 100.18(1) "does not provide a cause of action for one vendor against a competitor for

---

(holding that potatoes produced (or packaged) in bags containing "Idaho" and "Grown in Idaho" certification marks after license had been revoked constituted counterfeiting).

representations the competitor made to third parties." (Def.'s Opening Br. (dkt. #30) 25 (quoting *Grice Eng'g, Inc. v. JG Innovations, Inc.*, 691 F. Supp. 2d 915, 922 (W.D. Wis. 2010)).)   Similarly, the Wisconsin Supreme Court in *Novell* construed the statute to require proof by the plaintiff  that the misrepresentation materially induced the plaintiff to sustain a loss to state a claim under Wis. Stat. § 100.18.  *Novell*, 2008 WI 44, ¶ 51.  In either case, plaintiff generally must be a member of the "public" or, at least, of the audience to whom the misrepresentation is directed to bring a claim under Wis. Stat. § 100.18(1).  *See also Spacesaver Corp. v. Marvel Grp., Inc.*, 621 F. Supp. 2d 659, 663 (W.D. Wis. 2009) (dismissing § 100.18(1) claim where plaintiff had not alleged that it was induced to act because of defendant's misrepresentation); *Thermal Design, Inc. v. Am. Soc. of Heating, Refrigerating & Air-Conditioning Engineers, Inc.*, 775 F. Supp. 2d 1082, 1090 (E.D. Wis. 2011) (rejecting plaintiff's § 100.18 claim where plaintiff did not allege that it relied on defendant's alleged misrepresentation).  Here, plaintiff has not alleged that it was misled by defendant's "School Specialty Exclusive" image, nor could it make such a claim in light of the undisputed record that the licensing contracts were terminated and Brainstorm was aware of that termination.  Rather, its claim rests on its (potential) customers' alleged confusion by the statement.

Even if this construction of Wis. Stat. § 100.18(1) is in error, plaintiff has failed to come forward on summary judgment with any evidence that consumers were induced by the "School Specialty Exclusive" image in purchasing KnowItAll products, much less that Brainstorm was injured by that reliance.  On the contrary, the undisputed record demonstrates that School Specialty was the only entity selling KnowItAll products even

after the licensing agreement was terminated.  In that way, even if consumers relied on the "School Specialty Exclusive" image in deciding to purchase the KnowItAll products from School Specialty, there was no other KnowItAll option for consumers at the time. In other words, defendant did not divert sales away *from plaintiff* or even another third party offering KnowItAll products.  Not only has Brainstorm failed to prove any injury because of School Specialty's use of that image, it appears plaintiff received royalty payments from those post-termination sales, which is likely the best approximation of its purely theoretical loss anyway.  Accordingly, the court will grant defendant's motion for summary judgment on plaintiff's § 100.18 claim as well.

## V. Trademark Infringement

As described above, defendant has admitted that it infringed plaintiff's KNOWITALL trademarks by marketing and selling products after June 11, 2013, in violation of the Lanham Act, 15 U.S.C. § 1125.  In an attempt to narrow the remaining issues, defendant seeks summary judgment, however, on the issue of whether plaintiff is entitled to attorneys' fees under the Lanham Act.  For infringement claims, attorneys' fees may only be awarded in "exceptional cases."  15 U.S.C. § 1117(a).

In *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626 F.3d 958 (7th Cir. 2010), the Seventh Circuit considered the meaning of "exceptional cases" in § 1117(a), holding that an award of attorneys' fees to the plaintiff is warranted if the defendant "had no defense yet persisted in the trademark infringement or false advertising for which he was being sued, in order to impose costs on his opponent."  *Id.*

at 963-64.  From the undisputed facts, the court concludes that plaintiff has failed to put forth any evidence demonstrating that defendant persisted in the trademark infringement in order to impose costs on plaintiff.  Rather, the record shows that while defendant mismanaged the discontinuation of its KnowItAll product line, its continued marketing and sales for approximately six months after the licensing agreements were terminated was not willful, but merely negligent, and certainly does not support a finding of "exceptional case" warranting an award of attorneys' fees.[19]  While plaintiff urges the court to delay a ruling on this issue, the court sees no basis for waiting.  *AA Sales & Assocs., Inc. v. Coni-Seal, Inc.*, 550 F.3d 606, 612-13 (7th Cir. 2008) ("As we have often observed, summary judgment is the 'put up or shut up' moment in the life of a case.").  Accordingly, the court will also grant defendant's motion for summary judgment that plaintiff's infringement claim is not exceptional under 15 U.S.C. § 1117(a).

All that remains unsettled for trial is the remedy for defendant's admitted trademark infringement lasting approximately six months after June 11, 2013, and resulting in approximately $5000 worth of sales and $3000 in profits.  The court questions whether damages need or even should be tried to a jury, especially since the best (if not the only reliable) approximation of plaintiffs' injury would seem to be the parties' agreed upon royalty payment schedule.  The court will await plaintiff's proffer at

---

[19] Plaintiff relies on the fact that the Oracle status was changed for some of the KnowItAll products in connection with a liquidation process.  (Pl.'s Opp'n (dkt. #43) 7 (citing Def.'s PFOFs (dkt. #29) ¶¶ 83-84).)  This acknowledgement, however, does not support a finding that defendant acted intentionally in selling the KnowItAll products.  To the contrary, the record reflects that defendant attempted to remove the KnowItAll products from sale, but was sloppy in its efforts for approximately six months, for which it paid in the form of continued royalties.

or before the final pretrial conference on January 6, 2015, as to other kinds of damages

before determining how best to proceed.

## ORDER

IT IS ORDERED that:

1)  defendant School Specialty, Inc.'s motion to strike errata sheets (dkt. #42) is GRANTED IN PART AND DENIED IN PART for summary judgment purposes only as described above;

2)  plaintiff Brainstorm Interactive, Inc.'s motion for leave to file an opposition to defendant's motion to strike (dkt. #)68 is GRANTED;

3)  defendant's motion for partial summary judgment (dkt. #24) is GRANTED;

4)  plaintiff's motion for partial summary judgment (dkt. #28) is DENIED;  and

5)  at the close of conclusion of this case, the clerk of court is directed to enter judgment (a) in defendant's favor on plaintiff's claims for copyright infringement, trademark counterfeiting, conversion, and violation of Wis. Stat. § 101.18(1); and (b) in plaintiff's favor on trademark infringement.  The only remaining issue is the appropriate remedy for defendant's admitted trademark infringement.

Entered this 5th day of December, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

41